## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **STANLEY ALDINGER, et al.,** | : | |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO. 1:CV-02-572** |
| | : | |
| | : | **(Judge Kane)** |
| **AMP, INC.; AMP, INC. SEVERANCE** | : | |
| **PAY PLAN; AMP, INC. EMPLOYEE** | : | |
| **SEVERANCE PLAN,** | : | |
| **Defendants** | : | |

### MEMORANDUM AND ORDER

On April 5, 2002, Plaintiffs, all former employees of AMP Incorporated's Signal Conditioning

Products Division, filed a civil action against Defendants, seeking severance pay and punitive damages

under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, et seq. ("ERISA").

The Court held a bench trial on August 26-27, 2003 and makes the following findings of fact and

conclusions of law.

**I.**   **Findings of Fact**

1.   Plaintiffs are all former employees of AMP Incorporated's ("AMP") Signal Conditioning
     Products Division located in Elizabethtown, Pennsylvania.  (Doc. No. 1, ¶¶ 4-41.)

2.   All Plaintiffs, with the exception of George Lurie and Larry Fackler, were non-exempt hourly-
     paid employees, entitled to the payment of overtime.  Plaintiffs Lurie and Fackler were salaried
     employees exempt from overtime payments.  (Plaintiffs' Trial Exhibit 16.)

3.   AMP is a corporation doing business in and under the laws of Pennsylvania.

4.   On September 1, 1991, AMP adopted a severance pay plan known as the "AMP
     Incorporated Severance Pay Plan" ("1991 Plan").  AMP adopted a second plan on August 20,
     1998, entitled the "AMP Incorporated Employee Severance Plan" ("1998 Plan") (collectively
     "Severance Plan Defendants").  (Doc. No. 92.)

5.     The Severance Plan Defendants are both "employee welfare benefit plans" within the meaning
       of Section 3(1) of the Employment Retirement Income Security Act of 1974 ("ERISA"); 29
       U.S.C. § 1002(1).  (Docs. No. 1, ¶¶ 45-47; 3, ¶¶ 46-47.)

6.     In 1998, AMP and Spectrum Control, Inc. ("Spectrum"), began discussions of a possible sale
       of certain assets in AMP's Signal Conditioning Products Division to Spectrum.  These assets
       included two facilities in Elizabethtown, Pennsylvania, which housed the Signal Conditioning
       Products Division facilities. (Doc. No. 92.)

7.     On February 1, 1999, AMP announced to the Signal Conditioning Products Division
       employees working at its Elizabethtown facilities that the assets of that division would be sold to
       Spectrum.  A memorandum concerning the sale was prepared by AMP and distributed to
       Plaintiffs at a meeting held for the employees of the Elizabethtown facility.  This memorandum
       stated, inter alia, that "Spectrum Control will compensate employees in a similar manner.  While
       salaries and specific benefits may change somewhat, in the aggregate, your compensation and
       benefits package will be equivalent to that of AMP."  The Memorandum also stated that
       "Spectrum Control will honor your AMP service credit in calculating severance benefits."
       (Doc. No. 92; T.R. at 6-9; Plaintiffs' Trial Exhibit 1.)[1]

8.     AMP and Spectrum entered into an Asset Purchase Agreement, which became effective on
       March 26, 1999.  There was no merger or consolidation with Spectrum, and Spectrum did not
       acquire any stock as a part of the Asset Purchase Agreement.  (Doc. No. 92.)

9.     AMP separated Plaintiffs from employment effective March 26, 1999.  Plaintiffs commenced
       employment with Spectrum on March 27, 1999, reporting to work for Spectrum for the first
       time on Monday, March 29, 1999.  Plaintiffs worked for Spectrum at the same facilities,
       worked the same shifts, at the same jobs, with the same wages as they had with AMP
       immediately prior to the sale.  (Id.)

10.    On April 2, 1999, Tyco International Ltd. ("Tyco") acquired more than thirty percent of the
       outstanding shares of AMP stock.  (Doc. No. 92.)

11.    Beginning in April, 2001, Spectrum began terminating Plaintiffs' positions within the
       Elizabethtown facility.[2]  Contrary to the representations in the 1991 Memorandum, Plaintiffs did

---

[1] For purposes of brevity, the trial transcript will be referred to as "T.R.", followed by the page number.

[2] Four plaintiffs voluntarily separated from Spectrum and one plaintiff, George Lurie, is still employed by Spectrum, as of August 27, 2003. (Doc. No. 92, Exhibit A.)

not receive service credit for their years at AMP in calculating severance benefits under Spectrum's severance plan.  (Doc. No. 92, Exhibit A; Defendants' Exhibits 8-43.)

12.     On or about December 20, 2001, Plaintiff Donna Coble sent a letter to the AMP Incorporated Severance Pay Plan to the attention of Mark Smith requesting information regarding the "AMP, Incorporated Employee Severance Plan for 1999."  Plaintiff Coble mailed the letter to the Harrisburg general mailing address of Tyco.  (Plaintiffs' Trial Exhibit 6.)

13.     At the time the letter was sent, Tyco no longer employed Mark Smith.  Also, AMP never sponsored a severance pay plan known as the AMP Employee Severance Pay Plan of 1999." (T.R. 305-06.)

14.     On December 26, 2001 and February 15, 2002, counsel for Plaintiffs sent letters addressed to the AMP, Inc. Severance Pay Plan to the attention of the Plan Administrator.  These letters were mailed to Tyco's general Harrisburg mailing address.  (Plaintiffs' Trial Exhibits 2 and 3.)

15.     Brian Cain, Director of Human Resources and administrator for both of the Severance Plan Defendants did not become aware of the above letters until June, 2002.  On June 7, 2002, Mr. Cain responded to the above letters, but did not provide the information sought.  Rather, with regard to Plaintiff Cobel's letter, Mr. Cain asked for clarification as to which plan she had sought in her December 2001 letter.  (Plaintiffs' Trial Exhibits 14-15; T.R. 311.)

## II.     Discussion and Conclusions of Law

This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 to decide questions arising

under ERISA.  29 U.S.C. § 1132(e)(1).

### A.     STANDARD OF JUDICIAL REVIEW

Although ERISA does not provide a standard of review for the denial of benefits, the Supreme

Court addressed the issue in Firestone Tire and Rubber Co. v. Bruch, stating:

> a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan . . . .  Of course, if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion.

489 U.S. 101, 115 (1989).  However, because both of the ERISA plans in controversy give Tyco or its officials final discretionary authority to interpret terms and determine benefit eligibility, the Court must review the company's decision under an "arbitrary and capricious standard."[3]  Bruch, 489 U.S. at 115; Martorana v. Bd. of Trustees of Steamfitters Local Union 420 Health, Welfare, & Pension Fund, 404 F.3d 797, 801 (3d Cir. 2005).  The Third Circuit Court of Appeals has compared the "arbitrary and capricious standard" to that of the "abuse of discretion standard."  See Abnathya, 2 F.3d at 45 n. 4 ("The 'arbitrary and capricious' standard is essentially the same as the 'abuse of discretion' standard").

However, the Supreme Court has instructed that "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'factor in determining whether there is an abuse of discretion.'"  Bruch, 489 U.S. at 115.  In Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377 (3d Cir. 2000), the United States Court of Appeals for the Third Circuit explained that when a company "both funds and administers benefits, it is generally acting under a conflict that warrants a heightened form of the arbitrary and capricious standard of review."  Pinto, 214 F.3d at 378.  "This heightened standard of review uses a sliding scale approach, intensifying the degree of scrutiny to match the degree of conflict, considering, among other factors, the

---

[3]  The 1991 Plan states, in pertinent part:  "The Company shall be the named fiduciary and the administrator of the Plan for purposes of the Employee Retirement Income Security Act of 1974, as amended ("ERISA").  The Company shall have the full and absolute discretionary power and authority to administer the Plan and to interpret the provisions hereof . . . ."  (Plaintiffs' Trial Exhibit 4, ¶ 6.)

The 1998 Plan states, in pertinent part, that:  "The Plan Administrator shall administer the Plan and may interpret the Plan, prescribe, amend and rescind rules and regulations under the Plan and make all other determinations necessary or advisable for the administration of the Plan, subject to all fo the provisions of the Plan."  (Plaintiffs' Trial Exhibit 5, ¶ 3.1.)

exact nature of the financial arrangement between the insurer and the company." McLeod v. Hartford Life & Accident Ins. Co., 372 F.3d 618, 623 (3d Cir. 2004).  When applying this standard, the Court must consider "the nature and degree of apparent conflicts" and adjust the review accordingly, so that the less evidence there is of conflict on the part of the administrator, the more deferential the standard becomes.  Pinto, 214 F.3d at 393.  This heightened arbitrary and capricious standard remains deferential to the decisions of the plan administrator, but not absolutely deferential.  Pinto, 214 F.3d at 393.[4]

Notwithstanding the above, review under the heightened standard does not allow the Court to substitute its own judgment for that of the plan administrator.  Stratton v. E. I. DuPont de Nemours & Co., 363 F.3d 250, 256 (3d Cir. 2004); Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc., 298 F.3d 191, 199 (3d Cir. 2002).  "A plan administrator's decision will be overturned only if it is clearly not supported by the evidence in the record or the administrator has failed to comply with the procedures required by the plan."  Orvosh v. Program of Group Ins. for Salaried Employees of Volkswagen of Am., Inc., 222 F.3d 123, 129 (3d Cir. 2000).  Moreover, "whether a claim decision is arbitrary and capricious requires a determination whether there was a reasonable basis for [the administrator's] decision, based upon the facts as known to the administrator at the time the decision was made."  Smathers, 298 F.3d at 199-200 (internal quotations omitted).  The Court may overturn a decision if, upon review of all the evidence that was before the administrator, the decision was "without reason,

---

[4] Moreover, "[b]ecause direct evidence demonstrating that a plan administrator's decision was actually influenced by the presence of a conflict of interest is rare, the absence of such direct evidence is not determinative that no conflict exists."  Bader v. RHI Refractories America, Inc., 111 Fed. Appx. 117, 120 n.3 (3d. Cir. 2004) (citing Pinto, 214 F.3d at 379).

unsupported by the evidence or erroneous as a matter of law." Abnathya v. Hoffman-LaRoche, Inc., 2 F.3d 40, 45 (3d Cir. 1993) (internal quotations and citations omitted).[5]  A conflict exists and a more searching scrutiny is required when "the impartiality of the administrator is called into question." Goldstein v. Johnson & Johnson, 251 F.3d 433, 435 (3d Cir. 2001).  Partiality can arise either because "the structure of the plan itself inherently creates a conflict of interest, or because the beneficiary has put forth specific evidence of bias or bad faith in his or her particular case." Id. at 435-36.

In this case, the structure of both severance plans create an inherent conflict of interest.  Tyco has discretionary authority, administers, and makes benefit payments under both plans.[6]  Moreover, a ruling by the administrator in Plaintiffs' favor would have cost the company $402,000 in benefits under

---

[5] The Third Circuit acknowledges that "there is something intellectually unsatisfying, or at least discomforting, in describing [the] review as a 'heightened arbitrary and capricious' standard." Pinto, 214 F.3d at 392.  The Court of Appeals instructs that "the . . . standard may be a range, not a point . . . [it is] more penetrating the greater is the suspicion of partiality, less penetrating the smaller that suspicion is." Id. at 392-93 (quoting Wildbur v. ARCO Chem. Co., 974 F.2d 631, 638 (5th Cir. 1992)).

[6] The 1991 Plan states, in pertinent part: "The Company shall be the named fiduciary and the administrator of the Plan for purposes of [ERISA]."  (Plaintiffs' Trial Exhibit 4, ¶ 6.)

The 1998 Plan defines "Plan Administrator" as: "a committee consisting of the Chief Financial Officer, Treasurer and Chief Human Resources Officer of the Company and following a Change of Control, a committee consisting of three persons, at least two of whom were directors or executive officers of the Company immediately prior to the Change in Control."   (Plaintiffs' Trial Exhibit 5, ¶ 1.14.)

either of the plans.  (Doc. No. 68.)  This leads to reasonable questions regarding the impartiality of the Plans' administrator in this matter.[7]

However, in considering the weight of such a conflict, the Third Circuit Court of Appeals instructs that courts should consider an employer's "incentives to avoid the loss of morale and higher wage demands that could result from denials of benefits" that at least partially counter any incentive not to pay legitimate claims.  Nazay v. Miller, 949 F.2d 1323, 1335 (3d Cir. 1991).  Accordingly, the Court will apply a moderately heightened arbitrary and capricious review of the Plans' administrator's decisions.  Any deference the Court affords his decisions will be appropriately tempered due to the administrator's conflict of interest.

**B.     SECTION 502(a)(1)(B)**

Section 502(a)(1)(B) of ERISA, establishes a cause of action under ERISA, by providing, in relevant part, that:

> [a] civil action may be brought by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

29 U.S.C. § 1132(a)(1)(B).  In order to bring an action under § 502(a)(1)(B), the litigant must be a participant or beneficiary of the plan and the action must be brought to enforce the participant's rights due under the plan.  A claim for benefits under ERISA § 502(a)(1)(B) is an assertion of a contractual

---

[7] In the instant case, Brian Cain, a director of human resources at Tyco, acted as the administrator with regard to Plaintiffs' requests for benefits under both plans.

right under the terms of the plan.  Burstein v. Ret. Account Plan for Employees of Allegheny Health

Educ. & Research Found., 334 F.3d 365, 381 (3d Cir. 2003).

ERISA recognizes two types of employee benefit plans: pension plans and welfare plans.  Int'l

Union v. Skinner Engine Co., 188 F.3d 130, 138 (3d Cir. 1999).  Employee welfare plans provide

"medical, surgical or hospital care or benefits, or benefits in the event of sickness, accident, disability,

death or unemployment. . . ."  29 U.S.C. § 1002(1).  Conversely, pension plans provide retirement

income to employees or result in a deferral of income by employees for periods extending to the

termination of covered employment or beyond.  29 U.S.C. § 1002(2)(A).  ERISA does not require

employers to establish benefit plans and, although ERISA contains elaborate vesting requirements for

pension benefit plans, it does not require automatic vesting of welfare benefit plans.  Smith v. Hartford

Ins. Group, 6 F.3d 131, 136 (3d Cir. 1993) (citing Hozier v. Midwest Fasteners, Inc., 908 F.2d 1155

(3d Cir. 1990)); Skinner, 188 F.3d at 138 (the distinction between pension and welfare plans "was not

merely an oversight on the part of Congress.").

The written terms of the plan documents are controlling.  In re Unisys Corp. Retiree Medial

Benefit "ERISA" Litig., 58 F.3d 896, 902 (3d Cir. 1995).  When considering claims under §

502(a)(1)(B), the plan is interpreted under principles of contract law.  Kemmerer v. ICI Ams., 70 F.3d

281, 288 (3d Cir. 1995).  Those principles require that the Court first look to the plain language of the

document.  If that language is clear, the Court may not consider extrinsic evidence.  Bill Gray Enters. v.

Gourley, 248 F.3d 206, 218 (3d. Cir. 2000).  Only when the plan provisions are ambiguous may

extrinsic evidence be used to aid the Court in interpreting the provision, although such evidence may not

be used "to create an ambiguity where none exists."  Gritzer v. CBS, Inc., 275 F.3d 291, 298 (3d Cir.

2002)(quoting Int'l Union, 188 F.3d at 145 (3d. Cir. 1999)).  Ambiguities are construed against the

drafter.  In re F.H. McGraw & Co., 473 F.2d 465, 468 (3d Cir. 1973).

### 1.    THE 1991 PLAN

At the time of the sale to Spectrum, AMP maintained two ERISA plans providing for severance

benefits.  The AMP Incorporated Severance Pay Plan was first made effective in 1991 and was

amended on March 1, 1999.  The 1991 AMP Incorporated Severance Pay Plan provides:

> A regular, full-time, salaried employee shall be eligible for consideration
> by the Company for the receipt of severance pay benefits in
> accordance with the provisions of the Plan . . . .
>
> * * *
>
> In no event, however, will severance pay be payable under the Plan in
> the following circumstances:
>
> * * *
>
> (e)    a termination from the Company's payroll due to the sale of a
> subsidiary, division, plant, or other operating assets where the
> terminated employee will continue or is offered the opportunity
> to continue on the payroll of the purchaser;

(1991 Plan, Plaintiffs' Trial Exhibit 4, ¶¶ 2-3).  The 1991 Plan defines a "regular full-time employee" as

"an employee of the Company employed to work at least a normal work week on a regular and

continuing salaried basis, whether on a weekly, bi-weekly, or semi-weekly payroll."  (Plaintiffs' Trial

Exhibit 4, ¶ 1(a).)  The first amendment to the 1991 Plan broadened coverage to include non-exempt

manufacturing employees.  (Plaintiffs' Trial Exhibit 4.)

It is undisputed that all Plaintiffs were participants under the 1991 Plan during their employment

with AMP prior to March 26, 1999.  However, the Court finds that under the clear language of the

plan, each Plaintiff is excluded from coverage pursuant to § 3(e).  The evidence at trial established that

each Plaintiff was offered and accepted employment with Spectrum in connection with the sale of

AMP's Elizabethtown facility.  As such, none of the Plaintiffs are entitled to severance benefits under

the plan.

Plaintiffs argue that this sale of the Elizabeth facility was a "sham," designed to avoid severance

liability.  (Doc. No. 52, at 7.)  Plaintiffs point to testimony by Plaintiff Sandra Metzler that "Spectrum

did not want the employees, they only wanted our technology, but that AMP decided that they

wouldn't sell without the employees."  (T.R. 7.)  Plaintiffs characterize this desire on the part of AMP

as an maneuver to avoid severance liability under the 1991 Plan.  (Doc. No. 52 at 7.)  However, the

Court finds no reliable evidence that the sale of the Elizabeth facility was a "sham" to avoid severance

liability under the 1991 Plan.  Moreover, Plaintiffs worked for Spectrum for over two years before their

employment was terminated.  On these facts, the Court finds that none of the Plaintiffs are entitled to

severance benefits under the clear language of the 1991 Plan.

### 2.  THE 1998 PLAN

Additionally, AMP maintained the AMP Incorporated Employee Severance Plan and

administered it through a committee of AMP executives.  The 1998 Plan created four classes, called

"Tiers", of employees eligible to participate in the plan.  The Tier in which an employee was placed

10

determined the benefits for which that employee was qualified.  Tier 1, described in the plan document

as "any employee of the employer listed in Schedule A attached hereto," offered the greatest level of

benefits.  (Plaintiffs' Exhibit 5, § 1.20.)  Similarly, Tier 2 was described in reference to a Schedule B.

(Id. § 1.21.)  For reasons that are not clear, Schedules A and B were never created.[8]  Tier 3 covered

employees not included in the top two tiers and who was in the company's salary brand M.  (Id. §

1.22.)  Tier 4 covered employees not covered under the top three tiers and who were "exempt

employee[s] immediately prior to a Change of Control."  (Id. § 1.23.)

Plaintiffs Lurie and Fackler were exempt employees and therefore at minimum fall within the

definition of a Tier 4 Employee.[9]  (Plaintiffs' Exhibit 16.)  Covered employees under the 1998 Plan are

eligible for benefits if they "incur[] a Severance . . . ."  (Plaintiffs' Trial Exhibit 5.)  The plan defines

"Severance" as "termination of an Eligible Employee's employment with the employer on or within two

years following the date of a Change of Control . . . ."  (Id., ¶ 1.17) (emphases added).  A "Change in

Control" occurs under the plan when, inter alia, "any Person is or becomes the beneficial owner . . . of

securities of the Company . . . representing 30% or more of either the then outstanding shares of

common stock of the Company or the combined voting power of the Company's then outstanding

securities[.]"  (Id., ¶ 1.3.)  The Court finds that, because Plaintiffs Lurie and Fackler terminated

---

[8] The Court notes the absence of the 1998 Plan's schedules in the record.  See also Gorini v. AMP Incorporated, 94 Fed. Appx. 913, 919 (3d. Cir. 2004) (discussing AMP and its successor Tyco's failure to create schedules for the 1998 Plan at issue here).

[9] Without access to Schedules A and B, it is impossible to know whether any of the Plaintiffs fall within Tier 1 or Tier 2.  Brian Cain testified at trial that only exempt employees were eligible employees under the 1998 Plan, but did not testify to the contents of the missing schedules.  (T.R. 301.) All of the Plaintiffs, except for Plaintiffs Lurie and Fackler, were non-exempt employees at all relevant times prior to the sale and thus were never participants in the 1998 Plan.

employment with AMP prior to a "change in control," they do not qualify for severance benefits under the plan.

Plaintiffs argue that the sale of the Elizabethtown facility to Spectrum was part of an "overall liquidation plan that was finalized through the sale to Tyco a week later." (Doc. No. 52, at 8.) Plaintiffs point to the April 2, 1999 purchase by Tyco of more than 30% of AMP's outstanding shares, an event that constitutes a "Change of Control" under the 1998 Plan. (<u>Id.</u>) Although this event occurred seven days <u>after</u> Plaintiffs' employment was terminated, Plaintiffs contend that the Spectrum sale was connected to the Tyco sale and should therefore be considered as part of the triggering "Change of Control." This argument has a certain amount of appeal. A plan that seeks to protect eligible employees from termination precipitated by a change in company ownership would have little value if management could preemptively terminate scores of employees on the eve of sale. Nevertheless, Plaintiffs offer no evidence, beyond the events' temporal proximity, that the Spectrum sale was part of an "overall liquidation plan." (Doc. No. 52, at 8.) Because Plaintiffs became employees of Spectrum prior to AMP's "change of control," even if only by a week, they do not qualify for severance benefits under the clear language of the 1998 Plan.

### 3.   AMENDING THE PLANS

In the alternative, Plaintiffs argue that the 1991 Plan and/or 1998 Plan were modified or amended to cover the Plaintiffs by virtue of a February 1, 1999 memorandum and verbal representations of AMP officials. (Doc. No. 86, at 8-10.) The 1991 Plan provides that:

> The Company reserves the right to amend the Plan at any time, in any
> manner whatsoever, or to terminate the Plan prospectively, provided,
> that no such amendment or termination shall operate to negate the right

of an employee to receive a payment on account of a layoff or
termination that pre-dated the amendment or termination.

(1991 Plan, Plaintiffs' Trial Exhibit 4, ¶ 8.)  Similarly, the 1998 Plan states that "[t]he Plan may be

amended or terminated by the Board or a duly appointed committee of the Board at any time . . . ."

(1998 Plan, Plaintiffs' Trial Exhibit 5, § 4.)

On February 1, 1999, AMP distributed an internal memorandum to employees of the

Elizabethtown facility.  This memorandum discussed the impending sale of the facility to Spectrum in a

question and answer format.  (Doc. No. 4.)  Questions seven and nine of the memorandum state,

respectively:

> What happens to my AMP benefits?
>
> Spectrum Control will compensate employees in a similar manner.
> While salaries and specific benefits may change somewhat, in the
> aggregate, your compensation and benefits package will be equivalent
> to that of AMP.
>
> What happens if, after I transfer to Spectrum, I'm laid off?
>
> Spectrum Control will honor your AMP service credit in calculating
> severance benefits.

(Plaintiffs' Trial Exhibit 1.)  Plaintiffs assert that this memorandum amended one or more of the

Severance Plan Defendants to provide severance benefits to Plaintiffs under the terms of the plan in the

event that they were terminated by Spectrum, notwithstanding the actual language of the plans.  (Doc.

No. 86, at 10.)  However, Plaintiffs offer no evidence that the 1999 Memorandum was intended by the

Severance Plan Defendants to modify either severance plan or that Plaintiffs reasonably believed the

memorandum to be such a modification.  The memorandum does not state that it is an amendment or

even explicitly references either severance plan.  At most, the statements describe what Spectrum will pay upon future termination, not a promise of future benefits or extended coverage under either plan. "While ERISA was enacted to provide security in employee benefits, it protects only those benefits provided in the plan." Hamilton v. Air Jamaica, Ltd., 945 F.2d 74, 78 (3d Cir. 1991).  Accordingly, the Court finds no reliable evidence that either plan was amended or modified as to bind the severance plans to pay benefits in the event Plaintiffs were terminated by Spectrum.

### 4.    AN INFORMAL PLAN

In the alternative, Plaintiffs argue that the above February 1999 Memorandum and oral representations by AMP officials created a separate informal plan.  (Doc. No. 86, at 10.)  ERISA does not define the term "plan" and the Third Circuit has held that "a plan need not be written" to be enforceable under ERISA.  Deibler v. United Food & Comm. Worker' Local Union 23, 973 F.2d 2206, 209 (3d Cir. 1992).  In deciding whether informal written or oral communications constitute a plan, the Court must "determine whether from the surrounding circumstances a reasonable person could ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." Hartford Ins. Group, 6 F.3d at 136 (adopting Donovan v. C.H. Dillingham, 688 F.2d 1367, 1373 (11th Cir. 1982)).

"No single act in itself necessarily constitutes the establishment of a plan, fund or program." Donovan, 688 F.2d at 1373.  Moreover, the decision to extend benefits does not "establish" a plan within the meaning of ERISA; rather it is the "reality of a plan . . . that is determinative," such as the employer's intention to provide benefits on a regular and long-term basis.  Id.; see also Gaylor v. John Hancock Mut. Life Ins. Co., 112 F.3d 460, 464 (10th Cir. 1997) (an employer's intention under an

14

informal plan to provide benefits on a long-term basis as part of a comprehensive insurance program

fulfills the "established or maintained" requirement of ERISA).  "If a company's properly published

written representations do not clearly limit benefits, the district court should consider all other evidence

that would indicate the presence or absence of an informal employee benefit plan."  Heinglein v.

Informal Plan for Plant Shutdown Benefits for Salaried Employees, 974 F.2d 391, 399 (3d Cir. 1992).

This includes "internal or distributed documents, oral representations, existence of a fund or account to

pay benefits, actual payment of benefits, a deliberate failure to correct known perceptions of a plan's

existence, the reasonable understanding of employees, and the intentions of the putative sponsor . . . ."

Id.  Oral representations by a knowledgeable and authorized management employee of the company

may be evidence of a benefit plan, "[s]o long as they do not modify the terms of a written plan[.]"  Id. at

399-401.  "[W]here the oral remarks give evidence of a separate plan not precluded by a written plan,

the district court may credit the representations as evidence of a plan. . . .  To do otherwise would

create a loophole inconsistent with ERISA by allowing a plan sponsor to make any promise regarding

benefits without obligation, so long as the promise is not reduced to writing."  "  Id. at 401.

In the instant matter, neither the 1991 Plan nor the 1998 Plan was written to be an all-inclusive

severance benefit plan.  In fact, the mere existence of two separate plans, each describing different

beneficiaries, different benefits, and different triggering events evidences the possibility that other

severance benefits plans might have existed.  However, based upon the evidence at trial, the Court

finds that the 1999 Memorandum does not constitute an informal employee benefit plan enforceable

under § 502(a)(1)(B).  The memorandum contained representations about Spectrum's future actions,

not the Severance Plan Defendants:  the promised benefits related to recognized time by Spectrum's

severance plan.  The Court finds no reliable evidence that the employees, nor the employer, understood the representations to create a separate severance benefit plan, with the Severance Plan Defendants continuing as fiduciaries.  Rather, the memorandum merely states that Spectrum would honor the employees' time at AMP under its own plan.

Similarly, Plaintiffs testified that AMP officials never directly addressed the issue of future severance accounting under Spectrum, outside of the 1991 Memorandum, nor treated the memo as evidencing a separate or new benefit plan.[10]   (T.R. 11.)  The Court also finds no reliable evidence of a separate source of financing for the alleged informal plan, nor procedures for receiving benefits under it. Further, Plaintiff points to allegations that Elizabethtown facility employees, not parties to this case, who were terminated from Spectrum less than a year after the acquisition received severance based upon their years at AMP.  However, Plaintiffs offered no evidence that these employees received severance benefits from the Severance Plan Defendants or a separate informal plan fund, rather then Spectrum honoring their AMP service credits when calculating severance benefits under its own plan.  (T.R. 61-63.)  As the Third Circuit Court of Appeals noted, a rule requiring "'all communications between an employer and plan beneficiaries to be considered along with summary plan descriptions as establishing a plan,' would diminish 'predictability as to the extent of future obligations . . . and [create] substantial disincentive for even offering such plans." Hartford Ins. Group, 6 F.3d at 136 (quoting Moore v. Metropolitan Life Ins. Co., 856 F.2d 488, 492 (2d Cir. 1988)).

--------

[10] However, neither did the officials correct the memorandum's misrepresentation regarding future severance.  Rather, it appears that AMP officials distributed a misleading or false representation to their employees and then refused to answer any questions regarding it.  These actions are highly troubling.

16

Moreover, even if an informal plan had been created, the informal plan itself would be the defendant in this action and not the Severance Plan Defendants.  ERISA plans are separate and distinct legal entities that can sue and be sued.  29 U.S.C. § 1132(d)(1); <u>Pascack Valley Hosp., Inc. v. Local 464A UFCW Welfare Reimbursement Plan</u>, 388 F.3d 393, 396 n.1 (3d Cir. 2004).  Although the Court sympathizes with Plaintiffs' situation, especially in light of the representations given to them by their former employer; for the reasons addressed above, the Court finds that Plaintiffs' have not demonstrated a right, pursuant to § 502(a)(1)(B) of ERISA, to recover benefits due to them under either of the Severance Plan Defendants.  As such, the Court will enter judgement in favor of Defendants on Counts I and II of Plaintiffs' Complaint.

### C.     BREACH OF FIDUCIARY DUTY

Plaintiffs claim that the Severance Plan Defendants breached their fiduciary duties by denying benefits, modifying the severance plans, failing to comply with their terms, and failing to respond to information requests regarding the benefit claims and appeals process.  (Complaint, Doc. No. 1, Counts III, IV, and V.)  ERISA provides that a fiduciary shall "discharge his duties with respect to a plan in the interest of the participants and beneficiaries," satisfying a "prudent man" standard of care. 29 U.S.C. § 1104(a)(1)(B).  A fiduciary's obligations under ERISA have been further delineated pursuant to the common law of trusts.  <u>See</u> <u>Cent. States, Southeast and Southwest Areas Pension Fund v. Cent. Transp., Inc.</u>, 472 U.S. 559, 570 (1985) ("rather than explicitly enumerating <u>all</u> of the powers and duties of trustees and other fiduciaries, Congress invoked the common law of trusts to define the general scope of their authority and responsibility"); <u>Ream v. Frey</u>, 107 F.3d 147, 154 (3d Cir. 1997).

As an initial matter, for the reasons discussed in Section II(B) supra, the Court finds that the

Severance Plan Defendants did not breach their fiduciary duty by denying benefits or failing to comply

with their terms of the plans, as Plaintiffs were not eligible beneficiaries under either plan. Similarly, an

employer does not owe its employees a fiduciary duty when it amends or abolishes a severance benefit

plan. Flick v. Borg-Warner Corp., 892 F.2d 285, 288 (3d Cir. 1989).

With regard to disclosure of information, ERISA requires the plan administrator to furnish

copies of plan documents only to participants and beneficiaries. 29 U.S.C. § 1024(b)(4). The term

"participant," for the purposes of ERISA's disclosure requirement, is defined as "any employee or

former employee of an employer . . . who is or may become eligible to receive a benefit of any type

from an employee benefit plan . . . ." 29 U.S.C. § 1002(7). The term "may become eligible" is a

broad phrase which the United States Supreme Court has interpreted to include "former employees

with a colorable claim to vested benefits." Bruch, 489 U.S. at 117-18 (holding that, "[i]n order to

establish that he or she 'may become eligible' for benefits, a claimant must have a colorable claim that .

. . he or she will prevail in a suit for benefits"). A colorable claim is not necessarily a meritorious one.

Id. "If an administrator has concerns about whether someone requesting access lacks a colorable

claim, it is free to ask for the facts upon which a claim to a benefit is being made. If . . . it fails to do so,

it proceeds at its own risk." Daniels v. Thomas & Betts Corp., 263 F.3d 66, 79 (3d Cir. 2001). The

clear message from the Supreme Court and Court of Appeals to ERISA plan administrators is: when in

doubt, disclose.

This duty extends beyond merely responding to requests about specific benefits. Rather, if the

fiduciary has reason to believe that a beneficiary is eligible for benefits that are not the precise subject of

his or her request, the fiduciary may violate its duties if it fails to provide information about those benefits.  Jordan v. Federal Express Corp., 116 F.3d 1005, 1016 (3d Cir. 1997); Glaziers & Glassworkers Union Local No. 252 Annuity Fund v. Newbridge Sec., 93 F.3d 1171, 1182 (3d Cir. 1996).

On December 20, 2001, Plaintiff Donna Coble sent a letter addressed to the "AMP Incorporated Severance Pay Plan," requesting an official plan document governing the "AMP, Incorporated Employee Severance Plan for 1999."  (Plaintiffs' Trial Exhibit 6.)  No such plan exists. On December 26, 2001 and February 15, 2002, Plaintiffs, through their counsel, sent two letters addressed to the "AMP, Inc. Severance Pay Plan" requesting "an explanation as to why these individuals have not received severance payments and whether there are any procedures [they could] exercise to see that those severance payments are made."  (Plaintiffs' Exhibits 2 and 3.)

By letter dated June 7, 2002, Brian Cain, a director of human resources at Tyco and plan administrator for both of the Severance Plan Defendants, replied to Plaintiff Coble's letter, requesting clarification as to which plan she was requesting.  (Plaintiffs' Trial Exhibit 15.)  On the same day, Mr. Cain also replied to Plaintiffs' attorney's letters - although in neither instance did Mr. Cain provided the information requested.  (Plaintiffs' Trial Exhibit 14.)

The Court finds that Plaintiffs' were not "participants" for the purposes of ERISA's disclosure requirement because they did not have a "colorable claim" to vested benefits at the time of their requests.  Due to the nature and timing of the Elizabethtown facility sale, the Plaintiffs were excluded from coverage under the clear language of both benefit plans.  In making their case, Plaintiffs focus heavily upon the representation made in the 1999 Memorandum, which they argue modified the existing

plans or created a new informal plan, and the general inequity of the situation.  It is easy for a court to

look back across the landscape of legal arguments and discovered facts that arise during the course of

litigation and identify arguably colorable claims to benefits that would not have been conceivable to a

prudent plan administrator examining Plaintiffs' requests.  Upon consideration of the evidence presented

at trial, the Court finds that the Severance Plan Defendants' administrator did not breach his fiduciary

duties to Plaintiffs in failing to timely respond to their requests.  Accordingly, the Court will enter

judgement in favor of Defendants on Counts III, IV, and V of Plaintiffs' Complaint.  An appropriate

Order follows.

**III.**    <u>**Order**</u>

  **AND NOW**, this 1st day of September, for the reasons discussed above, **IT IS HEREBY**

**ORDERED** that **JUDGMENT** is **ENTERED** in favor of the Severance Plan Defendants and against

Plaintiffs on all counts of the Complaint.  The Clerk of Court is directed to close the file.


        <u>s/Yvette Kane    </u>
        Yvette Kane
        United States District Judge

Dated: September 1, 2005